**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-60038-DAMIAN**

UNITED STATES OF AMERICA,

vs.

DANIEL JAMES RIGGS,

     Defendant.

_____/

## DEFENDANT DANIEL JAMES RIGGS' SENTENCING MEMORANDUM IN SUPPORT OF A MOTION FOR DOWNWARD VARIANCE

Defendant, DANIEL JAMES RIGGS ("Daniel"), by and through the undersigned counsel, hereby presents this Sentencing Memorandum to aid this Honorable Court in its determination of the sentence to be imposed. Based upon supporting factors found in *18 U.S.C. § 3553(a)*, a sentence of 15 years imprisonment is requested.

### I. INTRODUCTION:

On November 17, 2025, Daniel pled guilty to Counts Three and Four of a four-count Superseding Indictment. Each of Counts Three and Four charged him with knowingly, persuade, induce, entice, and coerce an individual who had not attained the age of 18 to engage in any sexual activity, in violation of *18 U.S.C. § 2422(b)*. Daniel understands the severity of these charges, which require the imposition of a mandatory minimum sentence of 120 months' imprisonment, with a minimum term of supervised release of five years. Related to this offense, Daniel has been incarcerated continuously since December 17, 2024.   A presentence investigation report (PSI) was disclosed on January 12, 2026. Sentencing is scheduled for March 11, 2026.

Daniel is a 33-year-old native Floridian. He has never married and has no children. He has no prior criminal history.

In addition to the mandatory nature of the imprisonment to be imposed in this case, the nature of the instant offense potentially bars him from receiving the benefit of an early release to a halfway house under *18 U.S.C. § 3624(c)(1)*. Further, any sentence imposed in this case will require sex offender registration, notification, and allow for a term of supervised release of life under the jurisdiction of this Court. For the rest of his life, where Daniel is permitted to live and work, and who he associates with, will be dictated by his status as a convicted sex offender.

Daniel agreed to a timely guilty plea, sparing the victims from the burden of trial and conserving judicial and prosecutorial resources. In doing so, he accepted full responsibility for his conduct as set forth in the factual proffer. Consistent with that acceptance, he has received the reduction provided pursuant to U.S.S.G. § 3E1.1.

Daniel is profoundly remorseful. As detailed in ¶4 of the PSI, pursuant to *18 U.S.C. § 3553(a)*, the parties have agreed to jointly recommend to the Court that a sentence no lower than 15 years imprisonment nor higher than 30 years imprisonment is appropriate in this case. Daniel confirms that he understands and acknowledges that the Court is under no obligation to impose a sentence below the advisory guidelines range.

With that said, we believe a sentence of 180 months or 15 years, for this first-time offender, adequately serves the retributive, punitive, protective, and deterrent goals of sentencing. This filing will present sentencing factors under *18 U.S.C. § 3553* in support of that sentence.

## II.  OBJECTIONS TO PSR:

Regarding ¶95 of the PSI, Daniel wishes to clarify that he has continued to suffer from episodic depression throughout his adult life. He discontinued medication due to the side effects.

While incarcerated, Daniel hopes to avail himself of every treatment offered to him.

Regarding ¶100 of the PSI, Daniel wishes to clarify that he graduated from Pompano Beach High School in 2011 and earned a Bachelor of Arts degree from Lynn University in 2017. Verification of this information has been provided to the US Probation Officer. Daniel further asks that the PSI be revised to report that his educational achievements have been verified.

Regarding ¶111, ¶112, ¶113, and ¶118 of the PSR, Daniel's stepmother, Regina Riggs, has confirmed that Daniel has only $300 left in his Truist bank account. All other money or investments that he had at the time of his arrest were spent on legal fees. We ask that references to Daniel's financial status being unknown be revised.

Regarding ¶131 of the PSI, through this filing, counsel will identify the factors that support a downward variance from the advisory guideline range.

### III.   SENTENCING MEMORANDUM:

### Application and Consideration of *18 U.S.C. § 3553(a)* Factors

Title 18, United States Code, Section 3553(a) contains the factors that the Court must apply to impose a reasonable sentence for the Defendant. Federal courts must consider all factors enunciated in Section 3553(a) when sentencing a defendant. Thus, in *United States v. Booker*, 543 U.S. 220, 245 (2005), the Supreme Court determined that the sentencing guidelines are now "effectively advisory." Moreover, district courts may not treat the sentencing guidelines as presumptively reasonable. *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456 (2007); *United States v. Hunt*, 459 F.3d 1180 (11th Cir. 2006). In many cases application of the guidelines does not yield a reasonable sentence. *United States v. Hunt*, 459 F.3d at 1184. "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a

unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Section 3553(a) instructs that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). The section lists a series of factors for the Court to consider in passing sentence. Those factors, in pertinent part, are the following:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed -
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
 (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(5) any pertinent policy statement-
 (A) issued by the Sentencing Commission . . . and
 (B) that . . . is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Also, *18 U.S.C. § 3582(a)* requires the sentencing court to "consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*." (Emphasis added.)

4

**18 U.S.C. § 3553(a) Factors**

Nature and Circumstances of the Offense

In September 2024, an 18-year-old female (hereinafter referred to as "Minor Victim 1") reported allegations of sexual assault by her tennis coach, Daniel Riggs, to law enforcement. Minor Victim 1's tennis coach, beginning in or around 2020 until August 2024, was Daniel Riggs. The pair engaged in a sexual relationship beginning in approximately November 2021, when Minor Victim 1 was 15 years old. The sexual conduct took place while the pair traveled abroad and domestically. During tournament trips, Daniel Riggs was considered Minor Victim 1's guardian.[1]

During the investigation of the sexual activity involving Minor Victim 1, law enforcement learned of another female seemingly involved in sexual activity with Daniel (hereinafter referred to as "Minor Victim 2"). It was established that Minor Victim 2 was 16 years old and engaged in sexual activity with Daniel briefly in September 2024, who was her tennis coach. As to both females, there has been no information provided to counsel that the sexual activities were anything but consensual. This statement is made with the explicit understanding that, pursuant to *Fla. Stat. § 794.05*, consent does not constitute a valid defense.

Guideline Calculations Based on the Offense Conduct

The advisory guideline range presented in the PSI is 292 to 365 months' imprisonment, based on a total offense level of 40 and a criminal history category of I. A term of imprisonment of 24 to 30 years for a first-time offender is unreasonable and unjustly punitive. Daniel understands he will be incarcerated, subjected to an extended term of supervised release, required to register as a sex

---

[1] Just to note the defendant filed a motion to dismiss the superseding indictment (D.E. 52 at pg. 6) and specifically addressed this issue.  The government agreed in their response (D.E. 54 at. Pg. 6) that Count I of the superseding indictment would be dismissed if the case proceeded to trial or plea.

offender, and face restrictions on where he may live, where he may work, and who he may associate with, for the remainder of his life. Acknowledging all of this still begs the question of whether a 24 to 30-year term of imprisonment is a reasonable punishment for this crime.

Clearly, there are victims who have suffered emotional harm. However, the interaction of enhancements produces a total offense level comparable to the most serious federal crimes, illustrating how dramatically § 4B1.5 escalates punishment.  For example,  had Daniel been convicted of certain violent crimes such as Second Degree Murder (§ 2A1.2), Conspiracy to Solicit Murder (§ 2A1.5), Kidnapping (§ 2A4.1), Air Piracy (§ 2A5.1), Bank Robbery (§ 2B3.1), Espionage (§ 2M3.1) or even Arson (§ 2K1.4), he would not be facing any higher than the total offense level applied in his case, after an adjustment for acceptance of responsibility.   The offense level for 1st degree premeditated murder is 43, a mere three-level difference from the offense level assessed for Daniel Riggs. As serious as the instant offense is, the guideline computations in this case are draconian.

The enhancement that most severely impacts Daniel's guideline computations is Repeat and Dangerous Sex Offender Against Minors, § 4B1.5, for which a five-level increase is assessed. This enhancement alone increases the low-end term of imprisonment by an astounding 74%.  Application of this enhancement seems straightforward, but it is far from it. In fact, this enhancement and its application are incredibly confounding.  Applying § 4B1.5(b) yields a sentencing range for Daniel that is actually higher than the range for a true recidivist sex offender under § 4B1.5(a) – i.e., the type of defendant that Congress and the Sentencing Commission were targeting with § 4B1.5. The Court is being asked to interpret a guideline in a way that would lead to obviously illogical results.

To clarify, § 4B1.5 contains two prongs. The first prong applies in any case in which the defendant's instant offense of conviction is a covered sex crime, §4B1.1 (Career Offender) does not apply, and the defendant committed the instant offense of conviction subsequent to sustaining at least

one sex offense conviction (§ 4B1.5(a)). The second prong applies in any case in which the defendant's instant offense of conviction is a covered sex crime, neither §4B1.1 (Career Offender) nor subsection (a) of §4B1.5 applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct.

As evidenced by the plea agreement and Daniel's admission that he engaged in sexual activity with both victims, §4B1.5(b) is satisfied.  As discussed above, the purpose of § 4B1.5 was to increase the sentences given to repeat sex offenders. It follows that convicted sex offenders who re-offend after being released from prison should receive more serious punishment than those defendants who have never been convicted of a sex offense. In this case, the reverse would happen.

Assuming arguendo that Daniel had been convicted of a prior sex offense, and that § 4B1.5(a) therefore applied, his advisory sentencing range would be 262 to 327 months based on a Total Offense Level of 35 and a criminal history category of V.[2]  *See* USSG §§ 4B1.5(a)(1)(A) & (a)(1)(B). In contrast, factually, *i.e.*, Daniel has never been convicted of a prior sex offense, but § 4B1.5(b) applies, and the resulting advisory guideline range is 292 to 365 months. S*ee* USSG §§ 4B1.5(b)(1),(b)(2). Incredibly, Daniel is subject to a higher advisory guidelines range than a defendant who had been previously convicted of a sex offense <u>and</u> committed a new qualifying sex offense.[3] This outcome is fundamentally unjust and contrary to the goals of sentencing. The Court

---

[2] Pursuant to §4B1.5(a)(1)(A), the offense level is determined under Chapters Two and Three. Therefore, as detailed in ¶72 of the PSI, the combined adjusted offense level is 38. 38 minus 3 levels for acceptance of responsibility results in a final total offense level of 35. An offense level of 35, with a mandatory criminal history category of V, see §4B1.5(a)(2)(B), results in an advisory guideline range of 262 to 327 months.

[3] Counsel for Ghislaine Maxwell raised this exact objection, challenging the anomaly that exists in §4B1.5 wherein Ms. Maxwell's guideline calculations were higher than those of a true recidivist offender. Case 1:20-cr-00330-AJN (SD/NY) D.E. 662, Memorandum of Ghislane Maxwell in Support of Her Objections to the Presentence Investigation Report, pg. 14-16

should not apply the guidelines in a way that creates no meaningful distinction between the true recidivist sex offenders and those offenders whose culpability is limited to an instant offense, such as Daniel Riggs. (citing *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses.").

The United States Sentencing Commission (U.S. Sentencing Commission) was contacted to confirm the unexpected guideline calculations related to §4B1.5 (Repeat and Dangerous Sex Offender Against Minors). Ms. Lori Baker, Senior Education and Sentencing Practice Specialist in the Office of Education and Sentencing Practice, with the U.S. Sentencing Commission, acknowledged that the Office of Education and Sentencing Practice, within the U.S. Sentencing Commission, is aware that §4B1.5 contains an anomaly wherein a sex offender with no prior sex offense conviction may score higher than a recidivist sex offender.

Again, to emphasize, this is a rare guideline application anomaly that results in a first-time sex offender with a Criminal History Category of I, having an advisory guideline range higher than a true recidivist sex offender, with a Criminal History Category of V. This is what has happened to Daniel Riggs.

This is a complicated guideline application that deserves further exploration. This outcome is not the product of greater culpability, but of structural mechanics. Section 4B1.5(a) operates through a floor and a criminal history reassignment. Section 4B1.5(b), by contrast, adds five offense levels. When the base offense level is already elevated, as it is here, we believe the five-level enhancement has a magnified, disproportionate impact. At high offense levels, each incremental increase produces exponentially greater punishment, pushing Daniel's guideline range deep into the upper end of the Sentencing Table.

The Court is not bound to ignore this structural distortion. Under *18 U.S.C. § 3553(a)*, the Court must impose a sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing. Where the mechanical application of a guideline produces a result that overstates relative culpability or creates an unwarranted disparity in comparison to true recidivist offenders, the Court may vary to ensure proportionality and fairness.

This is such a case. Daniel's offense level is already 38 before the enhancement. The additional five levels function not as a modest adjustment but as a dramatic escalation, yielding a range more severe than that faced by a recidivist offender with a qualifying prior conviction. That structural anomaly is an appropriate and legally permissible consideration in determining a sentence that is sufficient, but not greater than necessary, under § 3553(a). Weighing the objectives Congress deemed necessary in the Sentencing Reform Act of 1984: honesty, uniformity, and proportionality in sentencing with the § 4B1.5 anomaly, we ask the Court to remedy the structural distortion by way of a downward variance under *18 U.S.C. § 3552(a)*.

In addition, counsel wants to note for the record that, according to publicly available documents from Ghislaine Maxwell's federal court proceeding in 20-CR-00330, SD/NY, Ms. Maxwell's PSI had a guideline imprisonment range of 292-365; yet, even after proceeding to trial, she received a sentence of 240 months' imprisonment, well below the advisory guideline range. If a defendant convicted after trial in one of the most publicly scrutinized sex offense cases in modern history received a sentence significantly below the guideline imprisonment range, then a first-time offender who accepted responsibility at the outset should not face a harsher advisory outcome, especially one driven by a technical guideline anomaly. This comparison further illustrates that the advisory range in Daniel's case is greater than necessary to achieve the purposes of sentencing under *18 U.S.C. § 3553(a)*.

9

<u>The History and Characteristics of the Defendant</u>

**Personal and Family History:** Daniel Riggs stands before the Court for sentencing as a 33-year-old man facing the consequences of his criminal conduct. He engaged in inappropriate sexual conduct with two young women in this case. Severe punishment will be imposed that will see Daniel incarcerated into his middle ages. Before being sentenced, Daniel plans to speak to the court. He intends to offer an apology to the victims and their families and hopes to provide some context for his actions. Although he will not attempt to justify his unacceptable behavior, he recognizes that his actions profoundly affected both the victims, their families, his family and himself.

Daniel's father, Lawrence Riggs, age 80, is a tennis coach who operated "Team Riggs" in Broward County, Florida. Daniel's mother, Teresa Saez, age 64, works as a financial auditor in Palm Beach County, Florida. As will become clear, tennis flows in the blood of the Riggs men.  A general internet search for "Riggs Tennis" returns stories about his grandfather, Bobby Riggs. Bobby Riggs, now deceased, is described as a brash tennis star. In 1973, Bobby Riggs, who famously boasted about male superiority, challenged female tennis star Billie Jean King to a "Battle of the Sexes." Bobby Riggs lost the much-hyped match, but he remained a showman and hustler on and off the court.

Lawrence Riggs' first wife was Margo. Lawrence and Margo had one child together, Jesse Riggs.  Jesse Riggs struggled with mental health and substance abuse issues. He committed suicide at the age of 19. These events occurred before Daniel was born. Lawrence and Margo Riggs divorced. Lawrence Riggs married Regina in approximately 1980, and they had a son, Robbie Riggs.  In the early 1980s, Lawrence Riggs was managing a bowling alley owned by his father in South Florida. Regina and her son, Robbie, resided in California at that time.  Lawrence Riggs, had been living in California with Regina and Robbie, but he relocated to South Florida at his father's behest to help with the bowling alley.

While managing the bowling alley, Lawrence Riggs began a romantic relationship with one of his employees, Teresa Saez (nee Ferguson). Lawrence Riggs was 39 when he began the relationship with Teresa, who was 22. It is important to note that Daniel's father is 17 years older than his mother. As previously noted, Lawrence Riggs was married to Regina Riggs at the time. Lawrence Riggs's bifurcated families coexisted for years, while Regina and Teresa did not know about the other. Teresa went on to have three children with Lawrence Riggs, including Daniel, and his sisters, Alexa and Amanda.

Regina and Robbie Riggs eventually relocated to South Florida and lived with Lawrence.  In the 1990s, the truth was exposed; however, neither Regina nor Teresa ended their relationship with Lawrence Riggs.  For years, Lawrence Riggs went back and forth between the women despite the women being aware of one another. Finally, in approximately 2002, Teresa ended her relationship with Lawrence Riggs. Thereafter, Lawrence remained married to Regina Riggs. Daniel was about ten years old during the events in 2002. Notably, Regina Riggs has always been a caring and welcoming individual to Lawrence's children with Teresa. She always acted as a loving caregiver for Daniel.

Daniel's mother is no longer married to Jorge Saez. At present, Lawrence and Regina Riggs remain married. Regina Riggs, age 72, resides in Pompano Beach with her husband and works as the administrator of their tennis business.

In 2002, Daniel's mother began fostering children, prompting Daniel to live primarily with his father and stepmother. This continued until Danny left for college.

Turning to the family dynamic throughout all of Daniel's formative years. It cannot be stressed enough that the dynamic was overwhelming for young Daniel. It was secretive, dysfunctional, unusual, volatile, confusing, temporary, complex, and many other words that a young

boy could not process.  Daniel and his siblings were often caught in the middle of the emotions and volatility. Daniel looked up to these adults as role models, but it's fair to say their influence had a negative impact on him. Further, Larry Riggs' perspective on women may have had a profound impact on Daniel.  This clearly could have contributed to Daniel's poor decision-making.

The other defining relationships in Daniel's formative years were his relationship with tennis and with his coach, Lawrence Riggs. Lawrence Riggs viewed Daniel as the "golden boy" and cultivated him to carry on the family's tennis legacy. As Daniel's coach, Lawrence Riggs was demanding and controlling, pushing him towards excellence. In both Daniel's tennis and personal life, his father managed him with military-level strictness, which was verbally and emotionally abusive. Daniel's sister, Alexa Riggs, confirmed their father was controlling and volatile, especially toward Daniel. Alexa reported that their father constantly screamed and was often angry. This traumatized Daniel. Their father controlled Daniel through fear, driven by the goal of excellence. If Daniel took a misstep, he would be punished. The punishments included yelling and berating, pushups, running, and standing still with his arms outstretched. Both Danny and Alexa were treated this way, but Daniel more so.

**Mental Health:** In high school, Daniel suffered from anxiety and attention deficit hyperactivity disorder. He was constantly worrying about his parents and the dysfunctional family dynamic.  He was pressured to attend Cornell University, far from home, to continue the family's tennis legacy. Upon arrival at college, Daniel quickly fell into a deep depression and simply "cracked" under the pressure. He suffered a mental health episode that left the entire family scared. Even Daniel's father was shaken by this episode and supported Daniel's decision to leave college and return home. Once home, for about two years, Daniel received psychiatric medication management and limited therapeutic services. He eventually discontinued the medications due to side effects. He

did not return to medications, but he continued to be chronically depressed.

**Family Support:** Daniel always took on the role of peacemaker between the various adults in his life that he loved, including his father, mother, stepmother, and siblings.  He always sought calm in a tumultuous home environment. Currently, all of Daniel's family remains incredibly supportive. In fact, his father, mother, and stepmother have a cordial relationship among themselves and are unified in their support for Daniel.

Based on all the relevant factors under *18 U.S.C. § 3553(a)*, especially the totality of factors presented in this memorandum, Daniel Riggs respectfully requests that this Honorable Court consider a downward variance from the advisory guideline range presented in the PSI.

The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and the Need to Afford Adequate Deterrence to Others

Respect for the law arises from sentences that are neither too lenient nor too harsh. Daniel's offense was a serious crime. We believe that a sentence of 15 years' incarceration sends a proper message that federal courts will punish this type of criminal activity appropriately, particularly in a situation highlighted by Daniel's dysfunctional childhood and his lack of criminal history. Incarceration for 15 years is a substantial term of incarceration. For these reasons, the requested sentence reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment. Regarding the matter of general deterrence, the Court must weigh the necessity of imposing a sentence severe enough to deter others from committing the crime at hand with the need not punish Daniel in an unduly harsh manner. To the extent that a 15-year sentence of incarceration becomes known to others, it sends the message that involvement in this criminal activity will lead to a lengthy term of imprisonment.

<u>The Need to Protect the Public and the Need to Provide the Defendant with Educational or Vocational Training or Medical Care</u>

This sentencing factor addresses the concept of direct deterrence to prevent Daniel from committing future crimes. It is unlikely that, upon completion of his sentence in this case, Daniel will ever commit another offense. This is emphasized by the fact that Daniel's criminal conduct arises primarily from severe childhood dysfunction. Daniel will avail himself of all therapeutic avenues available to him within the Bureau of Prisons. Upon his release, he will be intensively supervised by the United States Probation Office with extensive conditions of release.

<u>The Kinds of Sentences Available</u>

Daniel understands that the Court will sentence him to a term of incarceration followed by a period of supervised release. He does not have sufficient funds to pay a fine in addition to any mandatory assessments and restitution. As presented in the PSI, the advisory guideline range for Daniel, a Level 40 offender with a criminal history category of I, is 292 to 365 months. The United States Sentencing Commission's "Sourcebook" FYE 2024 provides sentencing statistics for the 61,678 federal criminal cases sentenced in FY2024.  According to Table 24 of the Sourcebook for FY2024, <u>98%</u> of all cases sentenced in FY2024 fell at or below a Total Offense Level of 40. [4]

Additional USSC data revealed the following for similarly situated defendants under the guideline scenario presented in the PSR. During the last five fiscal years (FY 2020-2024), there were only 33 defendants whose primary guideline was § 2G1.3, with a Total Offense Level of 40 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 assistance departure. Of the 33 defendants (100%) who received a sentence of imprisonment, the average was 218 months, and the median was 200 months. [5]  Both the average and median terms of imprisonment

---

[4] See USSC Sourcebook FY2024, Table 24 (See Appendix 1).
[5] https://sinjsin.ussc.gov/analytics

imposed fall well below the advisory guideline range presented in Daniel's PSI, that is 292 to 365 months. The low number of statistically similar defendants underscores the rarity of such a data set.

As further reflected in the USSC Sourcebook, FY 2024, Table 30, in the Southern District of Florida, downward variances were granted in 39.8% of the 1,341 cases (across all offenses). [6] The extent of downward variances by type of crime (Table 40) was 31.3% and 26%, for the mean and median percentage decrease, respectively, for "sexual abuse" offenses. [7] This statistic demonstrates that downward variances are routinely granted when the charges and guidelines used are like those operative in Daniel's sentencing calculations. A sentence of 15 years would not result in an unwarranted sentencing disparity. Moreover, it would fall within the heartland of all similar cases, which routinely grant downward variances to similarly situated defendants.

The Need to Provide Restitution to Any Victims of the Offense

Restitution is mandatory in this case if either victim makes the request.

Bureau of Prisons Issues Unique to Daniel Riggs

Because of the nature of his conviction, Daniel will likely be ineligible for camp designation and certain early release programs, meaning any term imposed will be served under more restrictive conditions than similarly situated non-sex offenders. Daniel is potentially not eligible for time in custody reductions associated with the First Step Act, RDAP, 2nd Chance Act or the Zero-Point Offender amendment. The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, inmates convicted of sex offenses are typically barred from designation to a minimum-security camp, may be designated further from friends and family, are not eligible for early release to a community

---

[6] See USSC Sourcebook FY2024, Table 30
[7] See USSC Sourcebook FY2024, Table 40

confinement center, and have difficulty finding any place to live as a registered sex offender. Pursuant to *18 U.S.C. § 3624(c)(1)*, generally, inmates serving a term of incarceration are to spend a portion of the final months (not to exceed 12 months) under conditions that will afford them a reasonable opportunity to adjust to and prepare for reentry of that prisoner into the community.  The offenses of conviction may bar Daniel from the benefits of these provisions, and the result is that any sentence imposed by this Court will require him to serve more jail time than most other inmates.

Additional Collateral Consequences

Beyond the term of imprisonment to be imposed, Mr. Riggs has already suffered and will continue to suffer substantial collateral consequences because of this conviction. He has lost his employment and professional standing, and upon release he will face significant barriers to obtain lawful employment due to mandatory sex-offender registration and related restrictions. His residential options will be limited, his associations regulated, and his activities closely monitored for years , potentially for life, under supervised release.

This conviction carries enduring consequences that extend well beyond incarceration, including permanent reputational harm and the lifelong obligations attendant to sex-offender status. These realities are properly considered under § 3553(a) in determining a sentence that is sufficient, but not greater than necessary.

## IV. CONCLUSION

Daniel has accepted responsibility for his involvement in this offense. He understands that the choices he made affected the victims' well-being in this case. For this, he is deeply ashamed and remorseful.

A downward variance to 180 months would meaningfully punish the conduct, protect the public, promote respect for the law, and reflect the seriousness of the offense, while avoiding the

disproportionate outcome produced by the structural mechanics of § 4B1.5(b). Such a sentence would be sufficient, but not greater than necessary.

Based upon the facts and *18 U.S.C. § 3553(a)* factors set forth above, counsel respectfully requests that the Court grant a downward variance to a 15-year term of imprisonment. A term of supervised release, of the duration ordered by the Court, which will follow the period of imprisonment.

Lastly, Daniel Riggs respectfully requests this court to recommend that he serve his time in a BOP facility as close to South Florida as possible so he can be visited by family.

Counsel thanks this Court for considering our Sentencing Memorandum.

Respectfully submitted,

/s/ Russell J. Williams
**RUSSELL J. WILLIAMS, ESQ.**
Seacoast Bank Building
12 Southeast 7th Street, Suite 700
Fort Lauderdale, FL 33301
Office: (954) 525-2889
Fax: (954) 206-9272
Florida Bar No. 727751
Email: Russell@rjwpa.law

17

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via

CM/ECF to the following: Assistant U.S. Attorney, Camille Smith this 26th day of February 2026.

/s/ Russell J. Williams
**RUSSELL J. WILLIAMS, ESQ.**
Seacoast Bank Building
12 Southeast 7th Street, Suite 700
Fort Lauderdale, FL 33301
Office: (954) 525-2889
Fax: (954) 206-9272
Florida Bar No. 727751
Email: Russell@rjwpa.law

18

**FEDERAL DEFENDANTS IN SELECTED CELL**

During the last five fiscal years (FY2020-2024), there were 33 defendants whose primary guideline was §2G1.3, with a Final Offense Level of 40 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 33 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 218 month(s) and the median length of imprisonment imposed was 200 month(s).

The sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the Commission's official position on any issue or case. Nor does the information provided reflect the Commission's position regarding the weight to be given, if any, to the above sentencing information in a court's determination of the appropriate sentence to be imposed.

If the court does consider the above sentencing information as part of its consideration of the factors in 18 U.S.C. § 3553(a) in imposing sentence, it should do so only after considering the properly calculated guideline range and any applicable departures provided for in the Guidelines Manual.

APPENDIX 1

Table 24

## SENTENCED INDIVIDUALS IN EACH OFFENSE LEVEL AND CRIMINAL HISTORY CATEGORY[1]
### Fiscal Year 2024



| OFFENSE LEVEL | TOTAL N | % | Cumulative % | CRIMINAL HISTORY CATEGORY I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 21 | 0.0 | 0.0 | 20 | 0 | 0 | 1 | 0 | 0 |
| 2 | 399 | 0.7 | 0.7 | 370 | 7 | 5 | 6 | 4 | 7 |
| 3 | 31 | 0.1 | 0.7 | 30 | 0 | 0 | 0 | 1 | 0 |
| 4 | 4,152 | 6.8 | 7.6 | 3,998 | 64 | 42 | 17 | 14 | 17 |
| 5 | 129 | 0.2 | 7.8 | 94 | 9 | 5 | 5 | 7 | 9 |
| 6 | 2,914 | 4.8 | 12.6 | 1,812 | 818 | 222 | 33 | 10 | 19 |
| 7 | 415 | 0.7 | 13.2 | 158 | 50 | 57 | 20 | 55 | 75 |
| 8 | 1,568 | 2.6 | 15.8 | 1,115 | 212 | 179 | 28 | 11 | 23 |
| 9 | 427 | 0.7 | 16.5 | 317 | 33 | 25 | 14 | 17 | 21 |
| 10 | 5,063 | 8.3 | 24.8 | 1,215 | 1,874 | 1,182 | 411 | 215 | 166 |
| 11 | 1,203 | 2.0 | 26.8 | 921 | 54 | 81 | 37 | 36 | 74 |
| 12 | 2,038 | 3.3 | 30.1 | 633 | 415 | 399 | 216 | 164 | 211 |
| 13 | 3,897 | 6.4 | 36.5 | 1,373 | 919 | 884 | 325 | 209 | 187 |
| 14 | 607 | 1.0 | 37.5 | 385 | 88 | 60 | 27 | 14 | 33 |
| 15 | 3,105 | 5.1 | 42.6 | 1,088 | 847 | 573 | 255 | 168 | 174 |
| 16 | 672 | 1.1 | 43.7 | 443 | 87 | 58 | 28 | 19 | 37 |
| 17 | 3,325 | 5.5 | 49.2 | 1,116 | 343 | 758 | 452 | 350 | 306 |
| 18 | 680 | 1.1 | 50.3 | 406 | 100 | 77 | 33 | 23 | 41 |
| 19 | 2,534 | 4.2 | 54.5 | 998 | 328 | 503 | 267 | 208 | 230 |
| 20 | 726 | 1.2 | 55.7 | 425 | 93 | 85 | 56 | 33 | 34 |
| 21 | 3,227 | 5.3 | 60.9 | 1,260 | 391 | 529 | 359 | 288 | 400 |
| 22 | 733 | 1.2 | 62.2 | 469 | 79 | 82 | 38 | 24 | 41 |
| 23 | 2,802 | 4.6 | 66.8 | 1,171 | 366 | 468 | 248 | 251 | 298 |
| 24 | 862 | 1.4 | 68.2 | 539 | 111 | 82 | 42 | 34 | 54 |
| 25 | 2,774 | 4.6 | 72.7 | 1,494 | 324 | 361 | 201 | 168 | 226 |
| 26 | 711 | 1.2 | 73.9 | 376 | 126 | 85 | 38 | 39 | 47 |
| 27 | 2,510 | 4.1 | 78.0 | 1,068 | 379 | 394 | 209 | 193 | 267 |
| 28 | 711 | 1.2 | 79.2 | 378 | 113 | 96 | 47 | 30 | 47 |
| 29 | 2,650 | 4.3 | 83.5 | 861 | 320 | 350 | 236 | 192 | 691 |
| 30 | 723 | 1.2 | 84.7 | 364 | 100 | 68 | 53 | 39 | 99 |
| 31 | 2,233 | 3.7 | 88.4 | 861 | 283 | 295 | 161 | 136 | 497 |
| 32 | 415 | 0.7 | 89.1 | 186 | 71 | 48 | 25 | 21 | 64 |
| 33 | 1,471 | 2.4 | 91.5 | 673 | 226 | 224 | 107 | 88 | 153 |
| 34 | 801 | 1.3 | 92.8 | 284 | 56 | 38 | 28 | 34 | 361 |
| 35 | 1,139 | 1.9 | 94.7 | 456 | 194 | 162 | 89 | 71 | 167 |
| 36 | 252 | 0.4 | 95.1 | 130 | 34 | 36 | 25 | 11 | 16 |
| 37 | 794 | 1.3 | 96.4 | 367 | 114 | 108 | 44 | 48 | 113 |
| 38 | 263 | 0.4 | 96.8 | 147 | 32 | 25 | 12 | 17 | 30 |
| 39 | 350 | 0.6 | 97.4 | 182 | 46 | 42 | 22 | 21 | 37 |
| 40 | 374 | 0.6 | 98.0 | 188 | 51 | 47 | 25 | 24 | 39 |
| 41 | 225 | 0.4 | 98.4 | 122 | 26 | 29 | 9 | 12 | 27 |
| 42 | 254 | 0.4 | 98.8 | 149 | 29 | 28 | 16 | 15 | 17 |
| 43 | 744 | 1.2 | 100.0 | 445 | 72 | 72 | 30 | 36 | 89 |
| TOTAL | 60,924 | -- | -- | 29,087 | 9,884 | 8,864 | 4,295 | 3,350 | 5,444 |
| % | | 100.0 | 100.0 | 47.7 | 16.2 | 14.5 | 7.0 | 5.5 | 8.9 |

[1] Of the 61,678 cases, 754 were excluded due to one or both of the following reasons:  missing offense level (750) or missing Criminal History Category (432).  Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2024 Datafile, USSCFY24.

Table 30

## SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE
### IN EACH CIRCUIT AND DISTRICT[1]
Fiscal Year 2024

| CIRCUIT / District | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 61,331 | 28,038 | 45.7 | 326 | 0.5 | 6,099 | 9.9 | 4,374 | 7.1 | 2,239 | 3.7 | 20,255 | 33.0 |
| D.C. CIRCUIT | 535 | 270 | 50.5 | 6 | 1.1 | 59 | 11.0 | 0 | 0.0 | 10 | 1.9 | 190 | 35.5 |
| District of Columbia | 535 | 270 | 50.5 | 6 | 1.1 | 59 | 11.0 | 0 | 0.0 | 10 | 1.9 | 190 | 35.5 |
| FIRST CIRCUIT | 2,010 | 708 | 35.2 | 4 | 0.2 | 230 | 11.4 | 1 | 0.0 | 65 | 3.2 | 1,002 | 49.9 |
| Maine | 132 | 35 | 26.5 | 1 | 0.8 | 25 | 18.9 | 0 | 0.0 | 3 | 2.3 | 68 | 51.5 |
| Massachusetts | 531 | 123 | 23.2 | 1 | 0.2 | 74 | 13.9 | 1 | 0.2 | 21 | 4.0 | 311 | 58.6 |
| New Hampshire | 118 | 26 | 22.0 | 0 | 0.0 | 16 | 13.6 | 0 | 0.0 | 5 | 4.2 | 71 | 60.2 |
| Puerto Rico | 1,120 | 496 | 44.3 | 2 | 0.2 | 110 | 9.8 | 0 | 0.0 | 35 | 3.1 | 477 | 42.6 |
| Rhode Island | 109 | 28 | 25.7 | 0 | 0.0 | 5 | 4.6 | 0 | 0.0 | 1 | 0.9 | 75 | 68.8 |
| SECOND CIRCUIT | 3,050 | 931 | 30.5 | 13 | 0.4 | 450 | 14.8 | 3 | 0.1 | 98 | 3.2 | 1,555 | 51.0 |
| Connecticut | 249 | 56 | 22.5 | 2 | 0.8 | 36 | 14.5 | 0 | 0.0 | 21 | 8.4 | 134 | 53.8 |
| New York | | | | | | | | | | | | | |
| Eastern | 727 | 168 | 23.1 | 1 | 0.1 | 127 | 17.5 | 1 | 0.1 | 37 | 5.1 | 393 | 54.1 |
| Northern | 504 | 269 | 53.4 | 6 | 1.2 | 91 | 18.1 | 0 | 0.0 | 22 | 4.4 | 116 | 23.0 |
| Southern | 1,042 | 239 | 22.9 | 0 | 0.0 | 104 | 10.0 | 2 | 0.2 | 14 | 1.3 | 683 | 65.5 |
| Western | 364 | 153 | 42.0 | 4 | 1.1 | 68 | 18.7 | 0 | 0.0 | 2 | 0.5 | 137 | 37.6 |
| Vermont | 164 | 46 | 28.0 | 0 | 0.0 | 24 | 14.6 | 0 | 0.0 | 2 | 1.2 | 92 | 56.1 |
| THIRD CIRCUIT | 2,482 | 934 | 37.6 | 4 | 0.2 | 475 | 19.1 | 14 | 0.6 | 60 | 2.4 | 995 | 40.1 |
| Delaware | 95 | 48 | 50.5 | 0 | 0.0 | 9 | 9.5 | 11 | 11.6 | 3 | 3.2 | 24 | 25.3 |
| New Jersey | 826 | 260 | 31.5 | 0 | 0.0 | 174 | 21.1 | 0 | 0.0 | 7 | 0.8 | 385 | 46.6 |
| Pennsylvania | | | | | | | | | | | | | |
| Eastern | 487 | 169 | 34.7 | 0 | 0.0 | 116 | 23.8 | 2 | 0.4 | 8 | 1.6 | 192 | 39.4 |
| Middle | 454 | 194 | 42.7 | 2 | 0.4 | 85 | 18.7 | 1 | 0.2 | 23 | 5.1 | 149 | 32.8 |
| Western | 523 | 193 | 36.9 | 2 | 0.4 | 83 | 15.9 | 0 | 0.0 | 16 | 3.1 | 229 | 43.8 |
| Virgin Islands | 97 | 70 | 72.2 | 0 | 0.0 | 8 | 8.2 | 0 | 0.0 | 3 | 3.1 | 16 | 16.5 |
| FOURTH CIRCUIT | 3,946 | 1,775 | 45.0 | 25 | 0.6 | 513 | 13.0 | 3 | 0.1 | 95 | 2.4 | 1,535 | 38.9 |
| Maryland | 435 | 121 | 27.8 | 0 | 0.0 | 72 | 16.6 | 0 | 0.0 | 25 | 5.7 | 217 | 49.9 |
| North Carolina | | | | | | | | | | | | | |
| Eastern | 823 | 454 | 55.2 | 13 | 1.6 | 210 | 25.5 | 0 | 0.0 | 5 | 0.6 | 141 | 17.1 |
| Middle | 283 | 131 | 46.3 | 1 | 0.4 | 13 | 4.6 | 0 | 0.0 | 1 | 0.4 | 137 | 48.4 |
| Western | 304 | 149 | 49.0 | 1 | 0.3 | 27 | 8.9 | 0 | 0.0 | 4 | 1.3 | 123 | 40.5 |
| South Carolina | 568 | 211 | 37.1 | 4 | 0.7 | 99 | 17.4 | 0 | 0.0 | 19 | 3.3 | 235 | 41.4 |
| Virginia | | | | | | | | | | | | | |
| Eastern | 761 | 382 | 50.2 | 4 | 0.5 | 28 | 3.7 | 0 | 0.0 | 30 | 3.9 | 317 | 41.7 |
| Western | 196 | 60 | 30.6 | 1 | 0.5 | 33 | 16.8 | 0 | 0.0 | 3 | 1.5 | 99 | 50.5 |
| West Virginia | | | | | | | | | | | | | |
| Northern | 346 | 181 | 52.3 | 0 | 0.0 | 20 | 5.8 | 3 | 0.9 | 1 | 0.3 | 141 | 40.8 |
| Southern | 230 | 86 | 37.4 | 1 | 0.4 | 11 | 4.8 | 0 | 0.0 | 7 | 3.0 | 125 | 54.3 |

## Table 30 (cont.)

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE | | UPWARD | | DEPARTURE §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **FIFTH CIRCUIT** | **17,614** | **11,881** | **67.5** | **68** | **0.4** | **958** | **5.4** | **370** | **2.1** | **622** | **3.5** | **3,715** | **21.1** |
| Louisiana | | | | | | | | | | | | | |
| Eastern | 342 | 193 | 56.4 | 1 | 0.3 | 46 | 13.5 | 1 | 0.3 | 4 | 1.2 | 97 | 28.4 |
| Middle | 94 | 46 | 48.9 | 1 | 1.1 | 20 | 21.3 | 0 | 0.0 | 0 | 0.0 | 27 | 28.7 |
| Western | 277 | 208 | 75.1 | 3 | 1.1 | 11 | 4.0 | 0 | 0.0 | 1 | 0.4 | 54 | 19.5 |
| Mississippi | | | | | | | | | | | | | |
| Northern | 178 | 77 | 43.3 | 3 | 1.7 | 40 | 22.5 | 0 | 0.0 | 3 | 1.7 | 55 | 30.9 |
| Southern | 322 | 219 | 68.0 | 1 | 0.3 | 35 | 10.9 | 0 | 0.0 | 3 | 0.9 | 64 | 19.9 |
| Texas | | | | | | | | | | | | | |
| Eastern | 1,134 | 664 | 58.6 | 14 | 1.2 | 71 | 6.3 | 0 | 0.0 | 6 | 0.5 | 379 | 33.4 |
| Northern | 1,219 | 752 | 61.7 | 12 | 1.0 | 122 | 10.0 | 0 | 0.0 | 11 | 0.9 | 322 | 26.4 |
| Southern | 6,122 | 3,504 | 57.2 | 26 | 0.4 | 388 | 6.3 | 349 | 5.7 | 540 | 8.8 | 1,315 | 21.5 |
| Western | 7,926 | 6,218 | 78.5 | 7 | 0.1 | 225 | 2.8 | 20 | 0.3 | 54 | 0.7 | 1,402 | 17.7 |
| | | | | | | | | | | | | | |
| **SIXTH CIRCUIT** | **4,322** | **1,564** | **36.2** | **13** | **0.3** | **783** | **18.1** | **9** | **0.2** | **221** | **5.1** | **1,732** | **40.1** |
| Kentucky | | | | | | | | | | | | | |
| Eastern | 437 | 216 | 49.4 | 1 | 0.2 | 84 | 19.2 | 0 | 0.0 | 11 | 2.5 | 125 | 28.6 |
| Western | 357 | 115 | 32.2 | 4 | 1.1 | 90 | 25.2 | 3 | 0.8 | 27 | 7.6 | 118 | 33.1 |
| Michigan | | | | | | | | | | | | | |
| Eastern | 639 | 191 | 29.9 | 1 | 0.2 | 69 | 10.8 | 0 | 0.0 | 13 | 2.0 | 365 | 57.1 |
| Western | 226 | 128 | 56.6 | 0 | 0.0 | 26 | 11.5 | 0 | 0.0 | 9 | 4.0 | 63 | 27.9 |
| Ohio | | | | | | | | | | | | | |
| Northern | 829 | 315 | 38.0 | 0 | 0.0 | 165 | 19.9 | 1 | 0.1 | 19 | 2.3 | 329 | 39.7 |
| Southern | 577 | 138 | 23.9 | 4 | 0.7 | 78 | 13.5 | 4 | 0.7 | 122 | 21.1 | 231 | 40.0 |
| Tennessee | | | | | | | | | | | | | |
| Eastern | 538 | 245 | 45.5 | 1 | 0.2 | 147 | 27.3 | 0 | 0.0 | 10 | 1.9 | 135 | 25.1 |
| Middle | 329 | 79 | 24.0 | 0 | 0.0 | 62 | 18.8 | 1 | 0.3 | 9 | 2.7 | 178 | 54.1 |
| Western | 390 | 137 | 35.1 | 2 | 0.5 | 62 | 15.9 | 0 | 0.0 | 1 | 0.3 | 188 | 48.2 |
| | | | | | | | | | | | | | |
| **SEVENTH CIRCUIT** | **2,009** | **684** | **34.0** | **7** | **0.3** | **198** | **9.9** | **0** | **0.0** | **75** | **3.7** | **1,045** | **52.0** |
| Illinois | | | | | | | | | | | | | |
| Central | 248 | 71 | 28.6 | 0 | 0.0 | 27 | 10.9 | 0 | 0.0 | 0 | 0.0 | 150 | 60.5 |
| Northern | 546 | 155 | 28.4 | 1 | 0.2 | 49 | 9.0 | 0 | 0.0 | 39 | 7.1 | 302 | 55.3 |
| Southern | 224 | 124 | 55.4 | 4 | 1.8 | 31 | 13.8 | 0 | 0.0 | 6 | 2.7 | 59 | 26.3 |
| Indiana | | | | | | | | | | | | | |
| Northern | 236 | 108 | 45.8 | 0 | 0.0 | 26 | 11.0 | 0 | 0.0 | 3 | 1.3 | 99 | 41.9 |
| Southern | 352 | 147 | 41.8 | 0 | 0.0 | 47 | 13.4 | 0 | 0.0 | 2 | 0.6 | 156 | 44.3 |
| Wisconsin | | | | | | | | | | | | | |
| Eastern | 286 | 49 | 17.1 | 0 | 0.0 | 12 | 4.2 | 0 | 0.0 | 4 | 1.4 | 221 | 77.3 |
| Western | 117 | 30 | 25.6 | 2 | 1.7 | 6 | 5.1 | 0 | 0.0 | 21 | 17.9 | 58 | 49.6 |
| | | | | | | | | | | | | | |
| **EIGHTH CIRCUIT** | **4,858** | **2,102** | **43.3** | **37** | **0.8** | **555** | **11.4** | **20** | **0.4** | **89** | **1.8** | **2,055** | **42.3** |
| Arkansas | | | | | | | | | | | | | |
| Eastern | 517 | 268 | 51.8 | 1 | 0.2 | 41 | 7.9 | 0 | 0.0 | 4 | 0.8 | 203 | 39.3 |
| Western | 207 | 80 | 38.6 | 2 | 1.0 | 22 | 10.6 | 0 | 0.0 | 0 | 0.0 | 103 | 49.8 |
| Iowa | | | | | | | | | | | | | |
| Northern | 295 | 167 | 56.6 | 14 | 4.7 | 42 | 14.2 | 0 | 0.0 | 3 | 1.0 | 69 | 23.4 |
| Southern | 328 | 122 | 37.2 | 0 | 0.0 | 41 | 12.5 | 0 | 0.0 | 1 | 0.3 | 164 | 50.0 |
| Minnesota | 375 | 130 | 34.7 | 2 | 0.5 | 38 | 10.1 | 0 | 0.0 | 31 | 8.3 | 174 | 46.4 |
| Missouri | | | | | | | | | | | | | |
| Eastern | 1,011 | 461 | 45.6 | 6 | 0.6 | 85 | 8.4 | 0 | 0.0 | 8 | 0.8 | 451 | 44.6 |
| Western | 783 | 290 | 37.0 | 0 | 0.0 | 153 | 19.5 | 0 | 0.0 | 7 | 0.9 | 333 | 42.5 |
| Nebraska | 440 | 179 | 40.7 | 0 | 0.0 | 10 | 2.3 | 18 | 4.1 | 3 | 0.7 | 230 | 52.3 |
| North Dakota | 327 | 106 | 32.4 | 2 | 0.6 | 117 | 35.8 | 2 | 0.6 | 5 | 1.5 | 95 | 29.1 |
| South Dakota | 575 | 299 | 52.0 | 10 | 1.7 | 6 | 1.0 | 0 | 0.0 | 27 | 4.7 | 233 | 40.5 |

## Table 30 (cont.)

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | | VARIANCE | |
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | | |
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| NINTH CIRCUIT | 10,694 | 2,794 | 26.1 | 67 | 0.6 | 948 | 8.9 | 3,361 | 31.4 | 564 | 5.3 | 2,960 | 27.7 |
| Alaska | 134 | 34 | 25.4 | 1 | 0.7 | 18 | 13.4 | 0 | 0.0 | 2 | 1.5 | 79 | 59.0 |
| Arizona | 3,836 | 1,239 | 32.3 | 19 | 0.5 | 76 | 2.0 | 1,874 | 48.9 | 59 | 1.5 | 569 | 14.8 |
| California | | | | | | | | | | | | | |
| Central | 917 | 242 | 26.4 | 5 | 0.5 | 162 | 17.7 | 4 | 0.4 | 55 | 6.0 | 449 | 49.0 |
| Eastern | 444 | 174 | 39.2 | 3 | 0.7 | 80 | 18.0 | 5 | 1.1 | 7 | 1.6 | 175 | 39.4 |
| Northern | 477 | 65 | 13.6 | 3 | 0.6 | 61 | 12.8 | 2 | 0.4 | 12 | 2.5 | 334 | 70.0 |
| Southern | 2,634 | 402 | 15.3 | 19 | 0.7 | 164 | 6.2 | 1,432 | 54.4 | 391 | 14.8 | 226 | 8.6 |
| Guam | 39 | 16 | 41.0 | 0 | 0.0 | 12 | 30.8 | 0 | 0.0 | 0 | 0.0 | 11 | 28.2 |
| Hawaii | 108 | 35 | 32.4 | 0 | 0.0 | 26 | 24.1 | 0 | 0.0 | 1 | 0.9 | 46 | 42.6 |
| Idaho | 304 | 104 | 34.2 | 4 | 1.3 | 51 | 16.8 | 10 | 3.3 | 16 | 5.3 | 119 | 39.1 |
| Montana | 366 | 128 | 35.0 | 1 | 0.3 | 69 | 18.9 | 0 | 0.0 | 4 | 1.1 | 164 | 44.8 |
| Nevada | 271 | 50 | 18.5 | 0 | 0.0 | 14 | 5.2 | 33 | 12.2 | 3 | 1.1 | 171 | 63.1 |
| Northern Mariana Islands | 40 | 30 | 75.0 | 0 | 0.0 | 4 | 10.0 | 0 | 0.0 | 2 | 5.0 | 4 | 10.0 |
| Oregon | 521 | 84 | 16.1 | 9 | 1.7 | 142 | 27.3 | 0 | 0.0 | 3 | 0.6 | 283 | 54.3 |
| Washington | | | | | | | | | | | | | |
| Eastern | 286 | 81 | 28.3 | 1 | 0.3 | 63 | 22.0 | 0 | 0.0 | 6 | 2.1 | 135 | 47.2 |
| Western | 317 | 110 | 34.7 | 2 | 0.6 | 6 | 1.9 | 1 | 0.3 | 3 | 0.9 | 195 | 61.5 |
| | | | | | | | | | | | | | |
| TENTH CIRCUIT | 4,863 | 1,999 | 41.1 | 68 | 1.4 | 336 | 6.9 | 586 | 12.1 | 271 | 5.6 | 1,603 | 33.0 |
| Colorado | 378 | 118 | 31.2 | 0 | 0.0 | 67 | 17.7 | 18 | 4.8 | 10 | 2.6 | 165 | 43.7 |
| Kansas | 337 | 162 | 48.1 | 4 | 1.2 | 56 | 16.6 | 5 | 1.5 | 6 | 1.8 | 104 | 30.9 |
| New Mexico | 1,695 | 662 | 39.1 | 12 | 0.7 | 59 | 3.5 | 478 | 28.2 | 117 | 6.9 | 367 | 21.7 |
| Oklahoma | | | | | | | | | | | | | |
| Eastern | 304 | 208 | 68.4 | 8 | 2.6 | 16 | 5.3 | 0 | 0.0 | 3 | 1.0 | 69 | 22.7 |
| Northern | 635 | 331 | 52.1 | 41 | 6.5 | 58 | 9.1 | 4 | 0.6 | 113 | 17.8 | 88 | 13.9 |
| Western | 682 | 322 | 47.2 | 0 | 0.0 | 32 | 4.7 | 1 | 0.1 | 2 | 0.3 | 325 | 47.7 |
| Utah | 653 | 138 | 21.1 | 1 | 0.2 | 34 | 5.2 | 68 | 10.4 | 12 | 1.8 | 400 | 61.3 |
| Wyoming | 179 | 58 | 32.4 | 2 | 1.1 | 14 | 7.8 | 12 | 6.7 | 8 | 4.5 | 85 | 47.5 |
| | | | | | | | | | | | | | |
| ELEVENTH CIRCUIT | 4,948 | 2,396 | 48.4 | 14 | 0.3 | 594 | 12.0 | 7 | 0.1 | 69 | 1.4 | 1,868 | 37.8 |
| Alabama | | | | | | | | | | | | | |
| Middle | 272 | 116 | 42.6 | 0 | 0.0 | 44 | 16.2 | 0 | 0.0 | 7 | 2.6 | 105 | 38.6 |
| Northern | 438 | 238 | 54.3 | 2 | 0.5 | 64 | 14.6 | 0 | 0.0 | 10 | 2.3 | 124 | 28.3 |
| Southern | 237 | 116 | 48.9 | 0 | 0.0 | 37 | 15.6 | 2 | 0.8 | 3 | 1.3 | 79 | 33.3 |
| Florida | | | | | | | | | | | | | |
| Middle | 1,135 | 521 | 45.9 | 3 | 0.3 | 158 | 13.9 | 1 | 0.1 | 8 | 0.7 | 444 | 39.1 |
| Northern | 259 | 97 | 37.5 | 0 | 0.0 | 50 | 19.3 | 3 | 1.2 | 3 | 1.2 | 106 | 40.9 |
| Southern | 1,341 | 687 | 51.2 | 4 | 0.3 | 102 | 7.6 | 1 | 0.1 | 13 | 1.0 | 534 | 39.8 |
| Georgia | | | | | | | | | | | | | |
| Middle | 425 | 256 | 60.2 | 0 | 0.0 | 43 | 10.1 | 0 | 0.0 | 4 | 0.9 | 122 | 28.7 |
| Northern | 474 | 139 | 29.3 | 1 | 0.2 | 41 | 8.6 | 0 | 0.0 | 18 | 3.8 | 275 | 58.0 |
| Southern | 367 | 226 | 61.6 | 4 | 1.1 | 55 | 15.0 | 0 | 0.0 | 3 | 0.8 | 79 | 21.5 |

[1] Of the 61,678 cases, 347 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2024 Datafile, USSCFY24.

Table 40

## EXTENT OF DOWNWARD VARIANCES
### BY TYPE OF CRIME[1]
### Fiscal Year 2024

| TYPE OF CRIME | N | Mean | | | Median | | |
|---|---|---|---|---|---|---|---|
| | | Sentence In Months | Decrease In Months | Percent Decrease | Sentence In Months | Decrease In Months | Percent Decrease |
| TOTAL | 17,680 | 56 | 30 | 43.3 | 35 | 17 | 34.3 |
| Administration of Justice | 233 | 10 | 12 | 63.3 | 4 | 8 | 62.1 |
| Antitrust | 2 | -- | -- | -- | -- | -- | -- |
| Arson | 19 | 31 | 22 | 45.2 | 24 | 18 | 37.7 |
| Assault | 276 | 50 | 26 | 40.6 | 28 | 15 | 30.9 |
| Bribery/Corruption | 165 | 21 | 22 | 56.7 | 12 | 15 | 57.9 |
| Burglary/Trespass | 17 | 16 | 13 | 57.1 | 9 | 10 | 59.3 |
| Child Pornography | 700 | 85 | 46 | 36.7 | 72 | 37 | 34.6 |
| Commercialized Vice | 12 | 3 | 11 | 82.2 | 0 | 11 | 98.8 |
| Drug Possession | 4 | 0 | 4 | 87.6 | 0 | 4 | 100.0 |
| Drug Trafficking | 7,157 | 78 | 40 | 38.6 | 63 | 27 | 31.3 |
| Environmental | 40 | 4 | 7 | 76.0 | 0 | 6 | 100.0 |
| Extortion/Racketeering | 40 | 33 | 23 | 49.5 | 21 | 12 | 40.5 |
| Firearms | 2,769 | 36 | 19 | 43.0 | 27 | 12 | 31.4 |
| Food and Drug | 8 | 11 | 35 | 75.7 | 11 | 36 | 74.4 |
| Forgery/Counter/Copyright | 42 | 12 | 19 | 67.9 | 5 | 15 | 85.6 |
| Fraud/Theft/Embezzlement | 1,932 | 20 | 16 | 57.2 | 12 | 10 | 50.0 |
| Immigration | 1,860 | 14 | 9 | 44.3 | 12 | 6 | 34.1 |
| Individual Rights | 57 | 31 | 20 | 45.4 | 21 | 12 | 36.8 |
| Kidnapping | 48 | 133 | 66 | 36.7 | 128 | 55 | 33.3 |
| Manslaughter | 18 | 25 | 22 | 55.9 | 19 | 18 | 56.7 |
| Money Laundering | 511 | 48 | 34 | 51.4 | 24 | 19 | 47.4 |
| Murder | 87 | 178 | 65 | 29.4 | 180 | 48 | 20.0 |
| National Defense | 103 | 25 | 25 | 56.3 | 16 | 19 | 51.4 |
| Obscenity/Other Sex Offenses | 126 | 11 | 10 | 49.8 | 12 | 8 | 35.4 |
| Prison Offenses | 125 | 9 | 8 | 49.7 | 7 | 6 | 44.7 |
| Robbery | 503 | 90 | 29 | 27.9 | 80 | 21 | 21.2 |
| Sexual Abuse | 455 | 169 | 70 | 31.3 | 180 | 60 | 26.0 |
| Stalking/Harassing | 87 | 22 | 14 | 50.7 | 12 | 12 | 42.9 |
| Tax | 246 | 12 | 13 | 64.2 | 6 | 12 | 66.7 |
| Other | 38 | 7 | 13 | 79.1 | 0 | 8 | 99.4 |

---

[1] Of the 61,678 cases, in 18,147 the sentence was a variance below the guideline range, either due to a government motion for a variance (6,269) or a non-government variance (11,878). Due to an inability to calculate the extent of departure for cases with a guideline minimum of life, 209 sentenced individuals were excluded from this table. Also, 258 individuals were excluded due to several logical criteria. Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively. The information in this table includes conditions of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2024 Datafile, USSCFY24.